UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARVIN LIDDELL LOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:03CV1844 RWS |
| | ) |
| THOMAS D. SANDERS, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Plaintiff Marvin Lott is an inmate at a Missouri correctional facility. In February 2003 he was assaulted by his cellmate. His lawsuit alleges that Defendants failed to protect him from his cellmate. He seeks monetary damages and injunctive relief. Defendants have moved for summary judgment. Because Defendants did not violate Lott's constitutional rights I will grant summary judgment to Defendants.

*Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence

to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

*Background*

This case concerns Lott's allegation that Defendants failed to correctly enforce a prison handcuff policy which led to an occurrence, on February 19, 2003, in which Lott was handcuffed in a prison cell with a cellmate who was not yet handcuffed. Before the prison staff could handcuff the other inmate, Lott was assaulted by the inmate and suffered physical injuries as a result. Lott is asking for $40,000,000 in damages. In addition, he seeks an order directing the Potosi Correctional Center ("Potosi") to change its handcuff policy in situations where two prisoners are placed in one cell. These are the only claims that were administratively exhausted by Lott before he filed this lawsuit.

During the pertinent time period of this case, Defendant Thomas Sanders was a Corrections Officer I at Potosi. Defendant Chuck Dwyer was an Assistant Superintendent at Potosi. Defendant Don Roper was the Superintendent of Potosi. Defendant Linda Wilkson was a Functional Unit Manager at Potosi.

The following undisputed facts are taken from Defendants' statement of uncontroverted material facts and from the record filed by the parties.

At the time of the incidents that gave rise to this litigation Lott was an inmate at Potosi. Potosi is a level 5 maximum security facility within the Missouri Department of Corrections. During the relevant time period of this lawsuit Lott was assigned to a cell in Housing Unit 3B.

Housing Unit 3B ("HU 3B") is an administrative segregation wing at the facility. Inmates

in Potosi's administrative segregation unit are the most dangerous and aggressive offenders in the custody of the Missouri Department of Corrections. In February 2003, the time period at issue in this lawsuit, while an offender was in administrative segregation, a caseworker was to visit the housing wing every thirty minutes. Correctional officers "walked" the housing wing every thirty minutes. Correctional classification assistants visited the housing wing several times each day to assist inmates with their concerns.

Inmates in HU 3B remain locked in their cells except for designated periods and occasions of regulated movement. A control room officer is located in a control room outside of the housing wing. The control room officer controls the cell door locking mechanisms to the cells in HU 3B. The cell doors do not swing open. They slide back on a track and the control office controls how far a cell door is opened.

Inmates in HU 3B do not attend meals in the prison's dining facility. They receive their meals in their cells through a six by seventeen inch food port door in the cell door. This same port door is used by correctional officers to handcuff inmates before they are removed from their cells.

Under Potosi's administrative segregation handcuff policy (the "Policy") an inmate on administrative segregation status should not be removed from his cell unless a minimum of two staff members are present. Under the Policy, before being removed from his cell, an inmate must back up to the cell door, place his hands through the food port door and allow a staff member to securely handcuff the inmates hands behind his back. If two inmates share a cell they must be handcuffed one at a time because the food port is only large enough to accommodate the hands of one offender at a time.

When two inmates share a cell, the Policy specifies that both inmates must be handcuffed

before the cell door is opened.  This precaution is necessary due to the considerable security risks involved in transporting the inmates in administrative segregation.  These security risks include the possibility that the cellmates could stage an altercation to compel corrections staff members to open the door before both inmates are restrained which would create the opportunity for the inmates to assault the corrections staff.

All inmates Potosi can request to be placed in protective custody.  Any staff member can take a protective custody request from an inmate.  Inmates may also declare a fellow inmate as an enemy who is then added to the inmate's enemy list.  When an inmate declares an enemy he may be placed in temporary administrative segregation for protection.

On February 7, 2003, Lott was assigned to a cell in HU 3B.  Lott's cellmate was Sherron Wilson.  Lott did not know Wilson and had never experienced any problems with him.  Lott never told anyone before February 19, 2003 that he was having any kind of problems with Wilson.  Lott, weighing 300 pounds at the time, stated that as of February 18, 2003, he did not feel any threat from Wilson.  (Defs.' Ex. F - Dep. of Lott p. 63)  Although Lott had placed other inmates on his enemy list, he never requested that Wilson be placed on Lott's enemy list.

Lott alleges that early in the morning of February 19, 2003[1], he spoke to a correctional officer, Defendant Sanders[2], and told him that he and Wilson were arguing and were not getting along.  Id. at 38  Lott asked Saunders to move him out of the cell.  Lott alleges that while he and Sanders were talking, Lott and Wilson were still arguing and that Wilson said to Lott, "I'm going to fuck you up."  Lott then asked Sanders, "Sir, can I see the caseworker?"  Sanders responded

---

[1] Based on the record it appears that this alleged conversation took place at approximately 8:52 a.m.

[2] Sanders worked the 2nd shift (7:30 a.m. to 3:30 p.m.) on February 19, 2003.

that he was not a caseworker (the staff member to whom to request such a move)[3] and then Sanders turned around and walked away.

Lott alleges that Sanders heard Wilson threaten Lott. According to Lott, Sanders returned to Lott's cell five minutes later and ask Lott if he wanted to go see the nurse. Id. at 63. Lott said. "Yes, I do." Id. Lott then turned around to be handcuffed and was handcuffed through the food port door. Id. According to Lott, Sanders then signaled to the control room officer to open the cell door and at that moment Wilson jumped off of his bunk and started slapping Lott's head and beating him. Id. Sanders ordered Wilson to stop and to turn around and be handcuffed. Id. at 37. Wilson did not comply and was sprayed with pepper spray by Sanders. Wilson then allowed himself to be handcuffed. Id. Lott was taken from the cell and taken to the medical unit. Lott estimates that the assault by Wilson lasted three to five minutes, "give or take some minutes." Id.

According to Sanders' affidavit, on the day at issue at 8:57 a.m., he was accompanied by corrections officer Chris Barton to take Lott to the nurse station. (Defs. Ex. J - Aff. of Sanders p. 2) After he restrained Lott but before he could restrain Wilson, Wilson assaulted Lott from behind. Id. Sanders and Barton ordered Wilson to stop but he ignored their commands. Barton "called a 10-49 (radio code for a fight) requesting back-up." Id. at 3. Barton and Sanders did not ask the control room officer to open the door because the inmates were equal in number to the officers (two). Sanders stated this was a security precaution because Wilson was still unrestrained and may have had a weapon and the incident may have been planned by the inmates "to hurt officers." Id. Lott's body was blocking the food port door of the cell which prevented Sanders

---

[3] According to Lott, a corrections officer, absent an emergency situation, cannot authorize the move of an inmate to another cell. (Defs.' Ex. F - Dep. of Lott at p.p. 38 and 52.)

and Barton from directing pepper spray at Wilson. Barton told the control room officer to partially open the cell door so that the officers could spray Wilson with mace. Id. The officers sprayed Wilson in the face with pepper spray and within a few seconds the spray began to take effect. The control officer "completely released the cell door and Sanders and Barton restrained Wilson and Lott. Wilson was removed from the cell and shackled to a restraint bench. According to Sanders, the fight was under control in less than a minute. Id.

*Discussion*

*Eleventh Amendment Immunity*

Lott brought his suit under 42 U.S.C. § 1983 for violating his right to be protected under the Eighth Amendment of the United States Constitution. His Complaint does not specify in what capacity the Defendants are being sued. "[A]bsent a clear statement that officials are being sued in their personal capacities, we interpret the complaint as including only official capacity claims." Murphy v. State of Arkansas, 127 F.3d 750, 754 (8th Cir. 1997)(internal quotation and citation omitted). This clearly-pleaded rule is not simply to ensure adequate notice to defendants. It is also strictly enforced because the Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees. Id.

I find that Lott's claims against Defendants are made solely against them in their official capacities. A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). As such, it is no different from a suit against the state itself. Id. Because Defendants are employees of an agency of the State of Missouri, Lott's claims are deemed to be against the State of Missouri. Defendants seek summary judgment on Lott's claims because the State of Missouri is immune from suit in federal court. See Pennhurst State School & Hosp. v.

Halderman, 465 U.S. 89, 100 (1984)(in the absence of consent, a suit in federal court in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment). The State of Missouri has not waived its immunity in this lawsuit.

In his opposition to summary judgment, Lott asserts that his claims are not subject to an immunity defense because he claims concern a violation of his rights through a policy and practice at Potosi regarding the administrative handcuff procedure. Lott asserts that under Monell v. Department of Social Services, 436 U.S. 658, 98 (1978), a governmental agency is not immune from a claim that a governmental policy and practice caused the violation of a civil right. Lott's reliance on Monell is unfounded. The Monell decision solely addressed the issue of an Eleventh Amendment immunity defense asserted by municipalities. The Court in Will affirmed that the Monell decision did not abrogate a state's right to assert Eleventh Amendment immunity. Will, 491 U.S. at 70. A state is not a person for purposes of Section 1983 actions. Id. at 71.

As a result I will grant Defendants motion for summary judgment for any monetary damages based on their invocation of Eleventh Amendment immunity.

*Injunctive relief*

Lott also asks that Defendants for injunctive relief against Defendants in their official capacity to prevent further violations of federal law. The Eleventh Amendment does not bar such prospective relief. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 277 (1997). However, Lott is no longer incarcerated at Potosi. He has been transferred to the Jefferson City Correctional Center in Jefferson City, Missouri. His claim for injunctive relief at Potosi is now moot. Smith v. Hundley,190 F.3d 852, 855 (8th Cir. 1999)(an inmate's claims for declaratory and injunctive relief to improve prison conditions are moot when he was transferred to another facility and was no longer subject to those conditions).

*Lott's request to amend his Complaint*

After Lott received Defendants' motion for summary judgment, he apparently realized that he sued Defendants only in their official capacity. He subsequently filed a motion on October 3, 2005, which I liberally construe as a motion to amend his pleading to sue Defendants in their personal and official capacities. A motion to amend pleadings is to be freely granted when justice so requires granted. Fed. R. Civ. P. 15(a). However, when the opposing party would be prejudiced by allowing such an amendment the district court may deny a motion to amend.

In the present case Defendants never had any notice that Lott was suing them in their personal capacities. Discovery is closed in this case. To allow Lott to proceed with a claim against the Defendants in their personal capacities would be highly prejudicial. As a result I will deny Lott's motion to amend to sue Defendants in their personal capacities.

I also will deny Lott's motion to amend because it would be futile. Lott claims that Defendants failed to protect him from an attack by his cellmate, Wilson.

In order to prevail on an Eighth Amendment failure-to-protect claim, an inmate must make two showings. First, the inmate must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. The second requirement concerns the state of mind of the prison official who is being sued. It mandates that the inmate show that the official knows of and disregards an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. This subjective requirement is necessary because only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. Webb v. Lawrence County, 144 F.3d 1131, 1135 (8th Cir. 1998).

Lott asserts that a dangerous condition arose when he was threatened by Wilson. Lott

alleges that Defendant Sanders failed to protect Lott when he removed him from his cell five minutes after that threat was made.

Lott does not assert any facts that Defendants Dwyer, Roper, or Wilkson had any knowledge of this threat. As a result, they cannot be personally liable for the injury to Lott. Nor can they be liable on the theory of *respondeat superior*. A supervisor cannot be held liable, on a theory of *respondeat superior*, for an employee's unconstitutional actions. White v. Holmes, 21 F.3d 277, 280 (8th Cir.1994). Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation. Boyd v. Knox, 47 F.3d 966, 968 (1995).

Lott has not presented any admissible evidence that Potosi's administrative handcuff policies or the manner in which they were implemented created conditions posing a substantial risk of serious harm to Lott.

Nor can Lott establish that Sanders is personally liable for failing to protect Lott. Lott has not presented any evidence that Sanders possessed actual knowledge that Wilson intended to cause Lott serious harm. To establish Sanders' liability Lott must establish that an excessive risk to Lott's health or safety was known or obvious to Sanders. This element of deliberate indifference must be viewed from Sanders' perspective at the time in question, not with hindsight's perfect vision. Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998). Even if Sanders had heard Wilson's remark to Lott he may not have deemed it to be a serious and immediate threat. Threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm. Id.

The duty to protect requires prison officials to take reasonable measures to abate substantial risks of serious harm, of which the officials are aware. Reece v. Groose, 60 F.3d 487,

491 (8th Cir. 1995). It is undisputed in this case that within five minutes of Lott's communication to Sanders that he wanted to be removed from his cell because he and Wilson were not getting along, Sanders came to the cell to remove Lott. It was at that point that Lott was attacked by Wilson. Sanders acted appropriately under the circumstances to stop the altercation and brought it to an end within a very short time. Under these circumstances, Lott has failed to establish that Sanders violated Lott's right to protection under the Eighth Amendment.

Based on the forgoing, Sanders is also entitled to qualified immunity because he was not deliberately indifferent to Lott's health and safety.

Accordingly,

**IT IS HEREBY ORDERED that** Plaintiff Marvin Lott's Motion to amend his Complaint [#121] is **DENIED**.

**IT IS FURTHER ORDERED that** Defendants motion for summary judgment [#110] is **GRANTED**.

**IT IS FURTHER ORDERED that** all other pending motions are **DENIED** as moot.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2006.